38

United States District Court
Southern District of Texas
FILED

OCT 0 2 2000

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Maria Elena Hernandez,
Miguel Angel Hernandez,
Heather Butler, individually and
on behalf of all others similarly
situated,

     Plaintiffs,

v.

CIBA-GEIGY Corp. USA,
Novartis Pharmaceuticals Corp.,
Children and Adults with
Attention-Deficit/Hyperactivity
Disorder (CHADD),
American Psychiatric Association,

     Defendants.

Case No. B-00-082

### DEFENDANT AMERICAN PSYCHIATRIC ASSOCIATION'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF DEFENDANTS' PROPOSED DISCOVERY/CASE MANAGEMENT PLAN

Defendant American Psychiatric Association ("APA") submits this Statement to advise the Court of its support of Novartis Pharmaceuticals' September 25, 2000 Motion for Bifurcation of Discovery and to provide the Court with a brief factual overview of the APA, the DIAGNOSTICAL AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM"), and the process by which diagnostic criteria are developed in the DSM. This additional information is provided to assist the Court in reviewing Defendants' proposed Discovery/Case Management Plan and assessing the utility and efficiency of the "phased" approach to case management reflected therein.

The APA believes that the premise of Plaintiffs' lawsuit is so fundamentally flawed that, as a matter of efficient case management, certain threshold issues must be resolved during an

initial phase, and discovery limited to class issues as described in Novartis Pharmaceuticals' Motion, before further merits proceedings.[1] More specifically, Plaintiffs' complaint, at its core, is premised on two remarkable propositions:

> (1) that Attention-Deficit/Hyperactivity Disorder ("ADHD"), a disorder which, for more than fifty years, has been widely recognized and accepted in the national and international healthcare communities, does not exist; and

> (2) that the American Psychiatric Association ("APA"), publisher of the DIAGNOSTICAL AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM"),[2] and CIBA-GEIGY/Novartis, the manufacturers of Ritalin®, somehow conspired to fabricate this "nonexistent" diagnosis, despite a well-documented, rigorous and open scientific process involving hundreds of eminent psychiatrists, psychologists, and other professionals.[3]

Suffice it to say, the APA does not believe these core allegations are remotely sustainable and has an overriding interest in resolving this litigation as expeditiously as possible. The APA is a nonprofit professional and scientific organization with limited resources, which must be free to engage in public scientific discourse without the chilling threat of having to defend unfounded litigation of this nature. More to the point here, however, the APA submits that sound case management requires an early opportunity to test the legal validity of Plaintiffs' complaint through, *e.g.*, Defendants' pending Rule 9(b) and other dispositive motions, and a phased discovery plan, once those motions are resolved, with discovery initially limited to class issues.

---

[1] *See* Defendant Novartis Pharmaceutical's Motion for Bifurcation of Discovery, filed September 25, 2000, which seeks an approach consistent with that discussed in this Supplemental Submission.

[2] The DSM is a widely-recognized classification of mental disorders – with a glossary of descriptions of the diagnostic categories – used to provide a common language for clinicians and research investigators to communicate about the disorders for which they have professional responsibility.

[3] That process has included extensive participation by the national and international research and clinical communities, the World Health Organization of the United Nations, and the National Institute of Mental Health ("NIMH") of the United States Department of Health and Human Services. In addition, wholly apart from the DSM process, the larger scientific and clinical communities in both the United States and Europe, *and* the two federal regulatory agencies responsible for authorizing the marketing of Ritalin® for treatment of ADHD (the Food and

Moreover, a "phased" approach should narrow – if not altogether eliminate – the exceptionally broad, multi-decade discovery in which Plaintiffs seek to embroil the parties. For these reasons, as more fully set out below, the APA respectfully requests this Court to adopt Defendants' proposed Discovery/Case Management Plan.

## I. Background on the DSM and ADHD.

Because the DSM and the ADHD diagnosis will be central to this case – including the development of the Court's case management plan – the APA wishes to provide the Court with certain background regarding its organization, the DSM, and the processes by which the disorder currently known as ADHD was developed. The APA is a scientific and professional association whose mission, in part, is to foster the development of psychiatric medicine and improve the mental health of those who suffer from debilitating disorders. One of the ways in which this mission is served is through the publication of the DSM, one of the leading texts classifying mental disorders.

The APA is committed to the highest standards of scientific integrity, validity and reliability in developing and reporting its findings in the DSM – all of which are essential to ensuring the continued participation in the DSM process of the outside "consultant-experts" on which the APA relies in classifying disorders, as well as the professional reputation of the APA and its membership. Additionally, the diagnostic criteria underlying the classifications in the DSM are developed through an open, committee-based process which reflects broad-based debate and participation by hundreds of experts from a variety of research and clinical disciplines, both nationally and internationally.

---

Drug Administration and the Drug Enforcement Agency), have for decades *independently* recognized the existence of ADHD.

As is clear from the "readily available" documents already made available by the APA to Plaintiffs,[4] the DSM – and each subsequent edition, published in seven- to-ten year intervals – reflects the culmination of intensive literature reviews by experts in the field, clinical testing, NIMH-sponsored field trials, and broad critical review and use (for validation testing) of the proposed diagnostic criteria by clinicians, investigators and other experts outside the APA within the broader mental health community.[5] In short, the work on the DSM-III, III-R, and IV and the children's disorders therein (of which ADHD is one) has involved hundreds of task force, work group, and field trial participants over a twenty-five year period. *See* APA's Rule 26(a) Disclosures, filed Sep. 29, 2000.

Moreover, the DSM, since its first publication in 1952, has been developed in collaboration with the authors of the International Classification of Diseases ("ICD"), a manual published by the United Nation's World Health Organization (*not* by the APA) as a standard classification for disease and injury for statistical purposes worldwide. The ICD first listed "hyperactive, hyperactivity child" and "hyperkinesia," precursors to what is now known as ADHD, as disorders in the ICD-7 (1955).[6] The ICD's recognition of "hyperactivity" was

---

[4]  *See* Exh. A (identifying DSM publications made available to Plaintiffs). Many drafts of the DSM, including the sections on ADHD, were published and disseminated widely for comment.

[5]  With respect to the ADHD diagnosis, for example, these experts include, *e.g.*, researchers from the Office of Child Health, NIMH and the Alcohol, Drug Abuse and Mental Health Administration of the United States Department of Health and Human Services, the World Psychiatric Association, and the Division of Mental Health of the World Health Organization.

[6]  The subsequent DSM edition, DSM-II (1968), recognized a disorder identified as "hyperkinetic reaction of childhood, . . . characterized by overactivity, restlessness, distractibility, and short attention span . . . ." The Forward and Introduction to DSM-II specifically references the international collaborative effort between the respective DSM and ICD task forces, begun in 1957, which culminated in the International Revision Conference of 1965 and the publication of ICD-8 in 1965, on which the DSM-II is based. *See also* ICD-8 (1965) (classifying "hyperkinesia, child" as a disorder); ICD-9 (1975) (listing "hyperkinetic

followed in 1968 by DSM-II's classification of a disorder identified as "hyperkinetic reaction of childhood." This collaboration between the ICD and DSM task forces[7] has continued up through successive publications of the ICD and the DSM to the ICD-10 (1992) and DSM-IV (1994).

As reflected above, the ADHD diagnosis, in various formulations, has been recognized as a childhood disorder since well before the time Plaintiffs claim the alleged fraud and conspiracy took place. In fact, as early as 1971, the then Department of Health, Education and Welfare convened a conference to discuss the available research and clinical experience regarding the treatment of "minimal brain dysfunction" or "hyperkinetic behavioral disturbance," earlier terms used for what today is known as ADHD, in school-aged children. The Conference described the disorder's major symptoms as:

> an increase of purposeless physical activity and a significantly impaired span of focused attention. The inability to control physical motion and attention may generate other consequences, such as disturbed mood and behavior within the home, at play with peers, and in the schoolroom.
> In its clear-cut form, the overt hyperactivity is not simply a matter of degree but of quality. The physical activity appears driven – as if there were an "inner tornado" – so that the activity is beyond the child's control, as compared to other children. The child is distracted, racing from one idea and interest to another, but unable to focus attention.

---

syndrome of childhood"); ICD-9-CM (1978) ("Attention deficit disorder with/without mention of "hyperactivity"); and ICD-10 (1992) ("diagnosis of hyperkinetic disorder requires the definite presence of abnormal levels of inattention, hyperactivity and restlessness that are pervasive across situations and persistent over time and that are not caused by other disorders such as autism or affective disorders"). Excerpts from each of the ICD and DSM versions cited herein are included in Exh. B.

[7]  The collaboration which produced DSM-II included the APA's Committee on Nomenclature and Statistics, with the United States National Committee on Vital and Health Statistics, the Surgeon General of the Public Health Service, and the Subcommittee on Classification of Diseases of the World Health Organization's Expert Committee on Health Statistics.

Report of the Conference on the Use of Stimulant Drugs in the Treatment of Behaviorally Disturbed Young School Children, attached as Exhibit A to APA's Reply in Support of Motion to Dismiss Under Rule 9(b) (filed Sept. 5, 2000).[8]

The scientific consensus regarding the *existence* of ADHD as a disorder has continued up through the present day. *See, e.g.,* the 1998 Consensus Statement published by the National Institutes of Health providing "state-of-the-art" "scientific evidence-based" information regarding effective treatments for ADHD; the August 2000 Surgeon General Report addressing the symptoms and treatment for ADHD; and the May 2000, American Academy of Pediatrics clinical guidelines for the diagnosis and evaluation of ADHD, *attached as* Exhibits to Novartis's Reply Memorandum in Support of Motion to Dismiss (Sept. 5, 2000). This consensus within the scientific communities regarding the existence of the disorder is no less evident in the federal regulatory bodies responsible for approving the marketing and use of Ritalin®.[9]

In short, for Plaintiffs to succeed they would have to prove a broad-based collusion on the part of the United States Government, the international research and scientific communities, the World Health Organization, and individual researchers, academicians and clinicians across the country, in addition to the APA and its co-Defendants – and all of this dating back to the 1970s

---

[8] The Conference concluded that "there is a place for stimulant medications [*e.g.* Ritalin®]in the treatment of hyperkinetic behavioral disturbance, but these medications are not the only form of effective treatment." Conference Report at 7.

[9] *See* 21 U.S.C. §§ 351, 812. For example, as early as 1970, the Food and Drug Administration, charged with reviewing the safety and efficacy of drug products, concluded that "methylphenidate . . . is [e]ffective . . . as an adjunct in the treatment of minimal brain dysfunction (hyperkinetic behavior disorders) in children." 35 Fed Reg. 15771 (Oct. 7, 1970). *See also* Physicians Desk Reference (2000), listing attention deficit/hyperactivity in children as an FDA-approved indication for Ritalin® (*attached as* Exh. B to the APA's Reply in support of Motion to Dismiss Under Rule 9(b), filed Sep. 5, 2000). Likewise, the Drug Enforcement Agency, charged with regulating the trafficking of certain controlled substances, has determined that methylphenidate has a "currently accepted medical use in treatment in the United States." 21 U.S.C. § 812 (b).

and earlier, and continuing to today. Plaintiffs' proof will thus be exceptionally difficult. Without proper case management, however, the impact of this remarkable lawsuit on the APA will nevertheless be substantial whether or not Plaintiffs ever prove their case.

## II. The Staged Litigation Plan Proposed by Defendants Is Vital to the Fair and Appropriate Resolution of this Case.

Because the APA engages in scientific and medical discourse with many clinicians and researchers to determine the proper classification and criteria for hundreds of identified mental disorders, the DSM process must be free to foster and incorporate debate on the validity and scope of diagnoses without threat of unsubstantiated fraud lawsuits. Not only do such lawsuits threaten to chill the exercise of an important fundamental right of free speech – scientific and medical debate[10] – but the cost of simply defending the Ritalin® lawsuits will impose an unbearable financial burden on the APA.

Moreover, as with Novartis, the merits discovery sought by Plaintiffs in the state action and the subject of Plaintiffs' recent Motion to Compel – consisting of thirty years of DSM history, APA financial records, and Ritalin® marketing and regulatory issues – would have no bearing on whether a class is appropriate, and therefore may never be warranted if class certification is denied. For these reason, efficient resolution of this action is critical, and the APA respectfully suggests that the Court adopt the phased litigation plan proposed by Defendants, which would allow the APA to test the Plaintiffs' legal theories and class action assertions before engaging in extensive merits discovery.

Respectfully submitted,

*Andrew C. Schirrmeister III* (signature)

Andrew C. Schirrmeister, III, Esq.
State Bar No. 17750650
Southern District of Texas Bar No. 5546
George R. Diaz-Arrastia, Esq.
State Bar No. 05805600
Southern District of Texas Bar No. 12
**Schirrmeister Ajamie LLP**
Pennzoil Place-South Tower
711 Louisiana, 21st Floor
Houston, TX 77002
(713) 860-1600 Telephone
(713) 860-1699 Facsimile

JoAnn E. Macbeth, Esq.
District of Columbia Bar No. 371264
Laurel Pyke Malson, Esq.
District of Columbia Bar No. 317776
William Anderson, Esq.
District of Columbia Bar No. 419340
**Crowell & Moring LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500 Telephone
(202) 628-5116 Facsimile

Attorneys for
American Psychiatric Association

---

[10] *See, e.g., Board of Trustees v. Sullivan*, 773 F. Supp. 472, 474-75 (D.C.D.C. 1991) (scientific expression and debate is as protected as political speech) (citing cases).

## Certificate of Service

I hereby certify that a true and correct copy of American Psychiatric Association's Supplemental Submission in Support of Defendants' Proposed Discovery/Case Management Plan has been served on all counsel of record in accordance with the Federal Rules of Civil Procedure, on this 2nd day of October 2000.

Andrew Schirrmeister III