49

United States District Court
Southern District of Texas
FILED

NOV 1 7 2000

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| Maria Elena Hernandez, Miguel Angel | § | |
| Hernandez, Heather Butler, individually and | § | |
| On behalf of all others similarly situated | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| | § | |
| Ciba-Geigy Corporation, U.S.A., | § | |
| Novartis Pharmaceuticals Corporation, | § | |
| Children and Adults with Attention, | § | |
| Hyperactivity Deficit Disorder (CHADD), | § | No. B-00-082 |
| American Psychiatric Association (APA), | § | |
| Defendants. | § | |

PLAINTIFFS' FIRST AMENDED COMPLAINT
FOR DAMAGES AND INJUNCTIVE RELIEF

Come now plaintiffs, Maria Elena Hernandez, Miguel Angel Hernandez, and Heather Butler, individually and on behalf of all others similarly situated as defined below, and file this their first amended complaint for damages and injunctive relief and would respectfully show as follows:

## I.      PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs Maria Elena Hernandez, Miguel Angel Hernandez and Heather Butler are residents of Texas.  They are purchasers of the drug Ritalin for the use of their children.

1

2.    Defendant CIBA-GEIGY CORP., USA is a corporation with its principal place of business in New Jersey.  It has been served in this action and need not be formally served with process.

3.    Defendant NOVARTIS CORP. is a corporation with its principal place of business in New Jersey.  It has been served in this action and need not formally be served with process.

4.    Defendant CHILDREN AND ADULTS WITH ATTENTION-DEFICIT/HYPERACTIVITY DISORDER (CHADD) is a corporation with its principal office in Maryland.  It has filed a responsive pleading in this action, and/or has been served, and need not formally be served with process.

5.    Defendant AMERICAN PSYCHIATRIC ASSOCIATION is a corporation with its principal office in Washington, D.C.  It has been served in this action and need not formally be served with process.

6.    This case was filed originally in state court, and removed to this Court on the basis of diversity jurisdiction.  Venue is proper in this Court because all or a substantial part of the events giving rise to the claim occurred in this district, and because one or more of the defendants transact business in this district.

2

## II.   FACTUAL BACKGROUND

7.   Ritalin is a psychostimulant drug.  It is the trade name for a

pharmacological substance known as methylphenidate.  Methylphenidate,

and therefore Ritalin, are "Class II" or "Schedule II" controlled substances

under the Controlled Substances Act.   See 21 U.S.C. §812;  21 C.F.R.

§1308.12.

8.   From approximately 1955 through 1995, the exclusive or primary

manufacturer and supplier of Ritalin in this country was defendant Ciba-

Geiby Corp., USA ("Ciba").  In 1996, Ciba merged with Sandoz

Pharmaceuticals Corp. to become defendant Novartis Pharmaceuticals

Corp. ("Novartis").  Upon information and belief, Novartis is presently,

and has been since 1996, the sole or primary manufacturer and supplier of

Ritalin in the United States.  Novartis has admitted in this action that it is

the successor to Ciba for all relevant purposes.  Novartis and Ciba will be

referred to collectively in this complaint as "Novartis."

9.   Novartis has manufactured, marketed and sold Ritalin since approximately

1955.  The product was promoted, beginning in the 1960's, by Novartis as

an antidepressant "which brightens moods and improves performance."

Defendant also claimed effectiveness for depression, chronic fatigue and

psychoneurosis.  From 1955 until the late 1970's, Novartis aggressively

sought applications and markets for Ritalin in an effort to boost sales and

profits.

10.     Today, 90% of all Ritalin prescriptions for ADD/ADHD are written in the United States.  Almost twenty percent of all teenage boys in the United States are receiving psychostimulant medication, with Ritalin clearly the leader in use among all such drugs.  In all, at least six million American children are taking Ritalin regularly.  Many prescriptions are written for children under five years of age.  From 1990 through 1997, production of Ritalin in the United States rose several hundred percent.

III.     FACTUAL BACKGROUND TO NAMED PLAINTIFFS' CLAIMS

11.     Maria and Miguel Hernandez are the parents of Miguel (Michael) Hernandez.  Miguel Hernandez was diagnosed with ADHD in approximately September, 1995.  His parents reviewed literature published by defendant CHADD and paid for by defendant Novartis and considered the representations found therein in accepting the diagnosis and agreeing to a prescription of Ritalin.  The Hernandez family would not have accepted the diagnosis, nor would it have permitted the prescription and drugging of young Miguel, had it known the financial relationships and connections among CHADD and Novartis and the American Psychiatric Association.  Nor would the Hernandez family have accepted the diagnosis had they known the extremely subjective and broad nature of its criteria.  As a result of the actions of these defendants, Miguel Hernandez took the drug Ritalin, as prescribed, from 1995 until June, 2000.  As a result, the family has expended certain sums of money for the drug Ritalin

4

CMPDF - www.fexisa.com

that it would not have spent had it known the true nature of the fraudulent

misrepresentations and the acts of conspiracy between the defendants.

12.     Heather Butler is the mother of Dakota Butler.  Dakota Butler was

diagnosed with ADHD in approximately the late fall of 1997.  Heather

Butler has not reviewed literature published by defendant CHADD and

paid for by defendant Novartis.  Ms. Butler was unaware of the

relationship and financial connections among CHADD, the American

Psychiatric Association, and Novartis.

However, Ms. Butler would not have accepted the diagnosis, nor would

she have permitted the drugging of young Dakota, had she known the

relationship and financial connections among CHADD and Novartis and

the nature of the relationship between the American Psychiatric

Association or the extremely subjective and broad nature of the diagnostic

criteria.  As a result of the actions of these defendants, Dakota Butler took

the drug Ritalin, as prescribed from 1997 until May, 2000.  As a result, the

family has expended certain sums of money for the drug Ritalin that it

would not have spent had it known the true nature of the fraudulent

misrepresentations and the acts of conspiracy between the defendants.

5

## IV.    GENERAL STATEMENT OF ALLEGATIONS

13.    This suit concerns the criteria used to reach a diagnosis of ADD/ADHD,

the failure to warn of serious side effects associated with Ritalin use, and

the failure to acknowledge and disclose that Ritalin does not improve

long-term scholastic performance.

14.    The repeated expansion of the diagnostic criteria for ADD and ADHD

have led to a tremendous increase in prescription for, and usage of,

Ritalin.  One study in Germany has shown an increase of almost 100% in

the prevalence of ADD and ADHD between the promulgation of DSM-III

and DSM-IV.  That is, under the much more expansive and subjective

criteria in the DSM-IV, almost twice as many children are being

diagnosed with ADD/ADHD.  Many of these children are treated,

frequently for years at a time, with Ritalin.

15.    In 1998, a "consensus conference" including members of the medical

profession, the pharmaceutical industry, academia and government was

convened to address ADD/ADHD and its treatment.  The "Consensus

Statement" released after this conference included the following statement

of concern:  "The existing diagnostic and treatment packages, in

combination with the potential risks associated with medication, point to

the need for improved awareness by the health service sector concerning

6

CVisPDF – www.fasoo.com

an appropriate assessment, treatment and followup. A more consistent set of diagnostic procedures and factor guidelines is of utmost importance.

16.    Because it is in their own substantial financial self-interest, defendants Novartis and APA have worked together to expand the diagnostic criteria for ADD/ADDHD, which criteria are published in the DSM. As noted above, more diagnoses mean more Ritalin sales for Novartis and more office visits for APA members. Some APA members' practices are devoted substantially to prescribing Ritalin.

17.    Because of the self-interested actions of these defendants, ADD/ADHD diagnoses and Ritalin prescriptions in the United States have skyrocketed.

18.    Only the internal files of Novartis and APA can fully show their cooperation in this regard. However, based on information and belief, plaintiffs expect to show that Novartis gave lavish financial support to APA -- a supposedly disinterested, independent professional body -- to induce APA to broaden the DSM criteria. Plaintiffs also will show that APA invited Novartis, through its agents or representatives, to participate in the drafting of some of these criteria.

19.    Plaintiffs will also show that Novartis has deliberately or negligently failed to warn of serious side effects associated with Ritalin, and has similarly deliberately or negligently failed to disclose the lacks of any proof that Ritalin improves long-term scholastic performance.

20.    Since merits discovery in this case has not taken place, plaintiffs are unable to recite in this complaint the particulars of every misstatement,

misrepresentation of omission made by defendants.  Plaintiffs expect to be
able to offer substantial proof on these matters after discovery has
concluded.  Plaintiffs can and do, however, aver that each defendant has
acted deliberately, because defendants' action further their own economic
self interest.  For Novartis, this is greater Ritalin sales.  For the APA, it is
greately increased professional income.  For CHADD, it is continued
financial support from Novartis.

## V.    ALLEGATIONS AGAINST DEFENDANT NOVARTIS

21.    Novartis, in combination with the American Psychiatric Association
       (APA), planned, conspired, and colluded to create, develop, promote, and
       confirm the diagnoses of Attention Deficit Disorder (ADD) and Attention
       Deficit Hyperactivity Disorder (ADHD), by vastly and needlessly
       overbroad diagnostic criteria, in a highly successful effort to increase the
       market for its product Ritalin.  Due to the concerted efforts of these
       parties, Attention Deficit Disorder was first listed in the Diagnostic and
       Statistical Manual of Mental Disorders (DSM) in 1980.  The DSM
       recognized ADHD as "diagnosis" in 1987.

22.    The DSM is a widely used and disseminated compendium of psychiatric
       diagnoses.  Listing of a "diagnosis" in the DSM provides an official-
       seeming, medical imprimatur to a particular set of symptoms or
       behaviours that may, in fact, be entirely normal.  A new official

"diagnosis" in the DSM, however, generates vast numbers of new prescriptions, increased insurance coverage, and great public attention.

23. In addition to its actions and involvement with the creation of the ADD and ADHD diagnoses, upon information and belief, Novartis took steps to promote and dramatically increase the sales of Ritalin by way of the following:

    1.    Actively promoting and supporting the concept that a significant percentage of children suffer from a "disease" which required narcotic treatment/therapy;

    2.    Actively promoting Ritalin as the "drug of choice" to treat children diagnosed with ADD and ADHD;

    3.    Actively supporting groups such as Defendant CHADD, both financially and with other means, so that such organizations would promote and support (as a supposed neutral party) the ever - increasing implementation of the ADD/ADHD diagnosis as well as directly increasing Ritalin sales;

    4.    Distributing misleading sales and promotional literature to parents, schools and other interested persons in a successful effort to further increase the number of diagnoses and the number of persons prescribed Ritalin.

24. Novartis deliberately, willfully, intentionally, and/or negligently promoted the diagnosis of ADD/ADHD and sales of Ritalin through its promotional literature and through its training of sales representatives. In so doing,

CMPDF - www.fenrir.com

despite knowledge of such problems and/or adverse reactions, Defendants willfully or negligently failed to warn consumers, doctors, and/or schools concerning the many significant hazards of methylphenidate use and prescription, including but not limited to the following:

1.     Cardiovascular problems, including palpitations, tachycardia, hypertension, arrythmias, chest pain and cardiac arrest;

2.     Central nervous system problems, including psychosis with hallucinations, excessive brain stimulation (convulsions), drowsiness, confusion, insomnia, agitation, anxiety, irritability, nervousness, dysphoria, impaired cognitive test performance, dyskinesias, depression, and zombie-like constriction of affect and spontaneity;

3.     Gastrointestinal problems, including anorexia, nausea, vomiting, stomach ailments, dry mouth, and constipation;

4.     Pituitary dysfunction, including growth hormone and prolactin disruption, weight loss, growth suppression, growth retardation, anemia, exfoliate dermatitis, leukopenia, etc.

25.     Despite information in the medical and scientific literature concerning these side effects of Ritalin use, Defendants failed in all respects to advise potential consumers, doctors, and/or schools, teachers or other interested parties of the nature and extent of such side effects.

26.     In addition, Novartis continuously misrepresented to the consuming

        public, physicians and other interested parties, the efficacy of the drug

        Ritalin, without ever advising such persons that Ritalin usage would not

        improve academic performance and/or have any long term effect on the

        symptoms associated with ADD and/or ADHD.

## VI.     ALLEGATIONS AGAINST DEFENDANT AMERICAN PSYCHIATRIC ASSOCIATION

27.     The members of the American Psychiatric Association who prescribed

        Ritalin have an immense financial stake in its use.  Each prescription

        requires a monthly doctor's visit, even if the child has been on Ritalin for

        years.  Because of the tremendous financial self-interest on the part of its

        members, the APA has deliberately broadened the diagnostic criteria for

        ADD/ADHD in the successive editions of the DSM.  The criteria are now

        so numerous, and so subjective, that virtually any normal child could be

        diagnosed with ADHD, and literally every child who displays any of a

        number of normal childhood behaviour could be so diagnosed.

        Upon information and belief, the APA has allowed representatives,

        employees or agents of Novartis to participate in the drafting and

        establishment of DSM diagnostic criteria.  This is because Novartis has

        given lavish financial support to APA, and continues to give such support.

28.     In so doing, Defendant APA aided, abetted and promoted the concept of

        Ritalin therapy for treatment of the vast numbers of children who began to

CVAPDF - www.fastio.com

be diagnosed with ADD and ADHD, pursuant to the APA's recommendations and support for the diagnosis.

On multiple occasions, officials and committee members of APA actually requested medical input from employees or contractor of Novartis, inviting them to participate in the drafting and establishment of DSM criteria.

29.     The interrelationship between Novartis and the APA contributed to the creation of extremely broad and subjective diagnostic criteria that could be, and ultimately were, applied to a large percentage of children in the United States, and for which the APA, in combination with other defendants, continued and presently continue to promote the prescription, use, and sale of Ritalin.

## VII.     ALLEGATIONS AGAINST DEFENDANT CHADD

30.     Defendant CHADD (Children and Adults with Attention-Deficit/Hyperactivity Disorder) is an unincorporated association dedicated and promoted to the principle that significant numbers of persons suffer from ADHD, as broadly over defined in the DSM.  CHADD works closely with Novartis and the American Psychiatric Association.

31.     Based on information and belief, CHADD has been a recipient of financial donations and contributions from Defendants Novartis for many years. CHADD received $748,000 from Novartis in the period 1991 to 1994 alone.  During the periods when CHADD received funding from Novartis,

CHADD deliberately made efforts to increase the sales of Ritalin, and to increase the supply of methylphenidate available in the United States, and to reduce or eliminate laws and restrictions concerning the use of Ritalin and methylphenidate in the United States, all at the request, and to the financial benefit of Novartis. In particular, CHADD lobbied for changing methiylphenidate from a "Class 2" substance to a "Class 3" substance, a change which would have resulted in a direct, substantial financial benefit to Novartis.

32.     Significantly, CHADD's literature has used the brand name Ritalin, as opposed to the generic term methylphenidate, in seeking to persuade parents of the benefits of psychostimulant medication. According to the Drug Enforcement Administration, "The relationship between Ciba-Geigy and CHADD raises serious concerns about CHADD's motive in proselytizing the use of Ritalin through the use of the brand name as opposes to the generic name methylphenidate in its literature." (DEA Press Release, Oct. 25, 1995, p. 15).

33.     Novartis made such financial contributions with the purpose of advertising and promoting sales of Ritalin - an internationally controlled substance. Novartis has thus repeatedly violated Article 10 of the United Nations Convention on Psychotropic Substances, 1019 U.N.T.S. 175 (1971).

34.     CHADD's activities nationwide have led to a significant increase in the amount of Ritalin taken by school children and have directly resulted in enormous profits to Novartis. In so doing, CHADD has promoted the

concept of a diagnosis of "disease" or "brain damage" as well as promoting

and supporting the concept that appropriate therapy for such a diagnosis is

a prescription for Ritalin.  In so doing, CHADD has acted as an agent of,

and/or has aided and abetted Novartis in its efforts to increase sales and

earn additional profits from the sale of Ritalin.


## VIII.  CAUSES OF ACTION
## FRAUD AND NEGLIGENT FAILURE TO WARN

35.    All of plaintiffs' previous allegations are incorporated herein by reference
as if realleged in full.

36.    For many years, all Defendants have made fraudulent misrepresentations
to the public, the scientific community and the media concerning the scope
and extent of ADD and ADHD.  These misrepresentations were made as
statements of scientific fact, but were known by defendants to be untrue.

37.    In the alternative, defendants made these statements recklessly and
without ascertaining their truth.

38.    In the alternative, Novartis negligently failed to warn of the side effects of
Ritalin, and its lack of efficacy, detailed above.

39.    Members of the public, including parents, other caregivers, educators and
medical professionals, relied on these statements and the warnings that
were given, albeit inadequately.  This reliance was known, anticipated,
intended and induced by defendants.

40.    The named plaintiffs and others similarly situated relied on these

misrepresentations and lack of warnings to their detriment by making

needless purchases of Ritalin, which they would not have made but for

defendants' misrepresentations and inadequate warnings.

## IX.  CONSPIRACY

41.    All of plaintiffs' previous allegations are incorporated herein by reference

as if realleged in full.

42.    All defendants conspired, combined and colluded to promote and

dramatically increase the sales of Ritalin by way of the following:

1.    Actively promoting and supporting the concept that a significant

percentage of children suffer from a "disease" which required narcotic

treatment/therapy;

43.    Campaigning for treatment of ADHD as a disability, thus resulting in a

great financial incentive for schools to seek or impel diagnoses of children

with ADHD.

2.    Actively promoting Ritalin as the "drug of choice" to treat children

diagnosed with ADD and ADHD;

3.    Distributing misleading sales and promotional literature to parents,

schools and other interested persons in a successful effort to further

increase the number of diagnoses and the number of persons

prescribed Ritalin.

4.      Deliberately neglecting to address or provide adequate information to consumers, doctors, and/or schools concerning the many significant hazards of methylphenidate   use and prescription, including but not limited to the following:

a.      Cardiovascular problems, including palpitations, tachycardia, hypertension, arrythmias, chest pain and cardiac arrest;

b.      Central nervous system problems, including psychosis with hallucinations, excessive brain stimulation (convulsions), drowsiness, confusion, insomnia, agitation, anxiety, irritability, nervousness, dysphoria, impaired cognitive test performance, dyskinesias, depression, and zombie-like constriction of affect and spontaneity;

c.      Gastrointestinal problems, including anorexia, nausea, vomiting, stomach ailments, dry mouth, and constipation;

d.      Pituitary dysfunction, including growth hormone and prolactin disruption, weight loss, growth suppression, growth retardation, anemia, exfoliate dermatitis, leukopenia, etc.

5.      Misrepresenting to the consuming public, physicians and other interested parties, the efficacy of the drug Ritalin, without ever advising such persons that Ritalin usage would not stimulate or improve academic performance and/or have any long term effect on the symptoms associated with ADD and/or ADHD.

16

6.     Facilitating the creation of new diagnoses in the DSM, made by reference to overbroad and overly subjective criteria.

## X.  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT

44.     Novartis is headquartered in New Jersey.  The acts and omissions complained of in this case took place, in substantial part, in New Jersey, and/or were directed from New Jersey.  The New Jersey Consumer Fraud Act thus applies to these acts and omissions.

45.     The New Jersey Consumer Fraud Act is set forth at N.J.S.A. section 56: 8-2 et seq.  Section 56: 8-19 affords a civil remedy that can be sought by any person damaged under the Act.

46.     Under the Act an unfair and deceptive trade practice includes the sale or advertisement of merchandise by any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact, with the intent that others will rely upon such concealment, suppression and/or omission.

47.     As detailed above, defendants suppressed and concealed their knowledge of the potentially harmful and unreasonably dangerous of Ritalin, and the lack of need for its use in many cases, with the intent that plaintiff and others similarly situated rely upon their fraudulent misrepresentations. Plaintiff and others similarly situated were unaware of the facts which

17

defendants knew but failed to disclose.  In reliance upon defendants' acts, omissions and misrepresentations, plaintiff and others similarly situated purchased, and continue to purchase Ritalin.

## XI.   CLASS ACTION ALLEGATIONS

48.   Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23.  The prerequisites for class certification are satisfied for the following reasons:

The class is so numerous that joinder of all members is impracticable. Upon information and belief, over six million children are currently using Ritalin in this country.  The class thus easily numbers in the millions.

49.    There are numerous questions of law and fact common to the class. These

include but are not limited to:

*whether defendants' representations have been false, or made without
knowledge of their truth;
*whether defendants intended plaintiff and other similarly situated to rely
upon these representations;
*whether plaintiff and other similarly situated in fact did rely on these
representations;
*whether defendants conspired to increase the amount of Ritalin
prescriptions and sales;
*whether the New Jersey Consumer Fraud Act applies to the acts and
omissions in this case and affords a remedy to all class members;
*the defendants' state of knowledge concerning the potential harms of
Ritalin, the lack of need for its prescription in most cases, and the lack of
knowledge of parents, the general public, medical professionals, and
educators on these subjects.

50.    There is no reason for each of these questions to be litigated in numerous

separate suits. Instead, they should be resolved in one proceeding.

51.    The claims of plaintiffs are typical of the claims of the entire class. There

is no antagonism between plaintiffs and the other members of the class,

and they assert the same claims that other class members could and would

assert. Further, plaintiff is not subject to any unique defense.

52.    Plaintiffs will fairly and adequately protect the interest of the class. They

have retained counsel who are experienced in product liability and

consumer fraud litigation, and who have substantial experience in class

action litigation. These counsel will vigorously and zealously represent

the class.

53.    Defendants have acted on grounds generally applicable to all class members. The injunctive relief prayed for in this complaint is therefore appropriate for all class members.

54.    The common questions of law and fact set forth above predominate over any questions that affect individual class members. This class action is therefore superior to any other method available for the fair and efficient adjudication of this controversy; Indeed, no other such method is available. Moreover, to plaintiff's knowledge, there is no other litigation concerning this controversy at present.

55.    Plaintiff therefore seeks certification of a class consisting of all persons in the United States and its territories who have purchased Ritalin within the four years proceeding the filing of this complaint, excluding any officers, or employees or their children, of any of the defendants.

XII.    REMEDIES SOUGHT

56.    As a result of the acts and omissions detailed above, plaintiffs and others similarly situated have been damaged and are entitled to certain legal remedies. Plaintiffs therefore pray for the following relief, to be awarded to her and all class members upon the certification of the class described above.

57.    Refund of all monies paid to purchase Ritalin within the four years preceding the filing of this complaint;

58.    Exemplary damages;

59. Treble damages pursuant to the New Jersey Consumer Fraud Act;

60. Injunctive relief in the form of an order permanently enjoining defendants from failing to provide all known information concerning the lack of long-term efficacy of Ritalin, and its adverse short-term and long-term effects, to purchasers, doctors, educators and the general public, and from failing to disclose the history of the establishment of the diagnostic criteria.

61. Reasonable attorneys' fees, expenses, and costs of suit; and

62. Any and all further relief to which plaintiffs and others similarly situated may show themselves justly entitled.

63. Plaintiffs demand a trial by jury of all issues in this action.

Respectfully submitted,

WATERS & KRAUS

Frank Costilla
State Bar No. 04856500
Federal I.D. 1509
Law Offices of Frank Costilla
5 East Elizabeth Street
Brownsville, Texas 78520
(956) 541-4982
(956) 541 3152 telecopier

Charles S. Siegel
State Bar No. 18341875
Federal I.D. 15736
Law Offices of Charles S. Siegel
3219 McKinney Avenue
Suite 2000
Dallas, Texas 75204
(214) 357 6244
(214) 871-2263

C. Andrew Waters
State Bar No. 20911450
Peter A. Kraus
State Bar No. 11712980
3219 McKinney Avenue
Suite 3000
Dallas, Texas
(214) 357-6244
(214) 357-7252 telecopier

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by facsimile to all counsel of record on November 17, 2000.

Earl B. Austin
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-6542
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

James A. O'Neal
Joseph M. Price
Bruce Jones
Faegre & Benson L.L.P.
2200 Norwest Center
90 South Seventh Street
Minneapolis, Minnesota 55404-3901
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

Eduardo Roberto Rodriguez
Mitchell C. Chaney
Rodriguez, Colvin & Chaney, L.L.P.
1201 East Van Buren
P.O. Box 2155
Brownsville, Texas 78522
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

Robert P. Charrow
Crowell & Moring
1001 Pennsylvania Ave., NW
Washington, DC 20004
Attorneys for American Psychiatric Association

Andrew C. Schirrmeister III
George R. Diaz-Arrastia
Schirrmeister Ajamie, L.L.P.
Pennszoil Place-South Tower
711 Louisiana, 21st Floor
Houston, Texas 77002
Attorneys for American Psychiatric Association


Gerald Zingone
Arent & Fox
1050 Connecticut Ave. N.W.
Washington, DC 20036
Attorneys for Children and Adults with Attention-Deficit/Hyperactivity Disorder
(CHADD)


Tom A. Lockhart
Adams & Graham, L.L.P.
222 East Van Buren, West Tower
Harlingen, Texas 78550
Attorneys for Children and Adults with Attention-Deficit/Hyperactivity Disorder
(CHADD)

Frank Costilla
Charles S. Siegel