

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 2 9 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| Maria Elena Hernandez, | § | |
| Miguel Angel Hernandez, | § | |
| Heather Butler, individually and | § | |
| on behalf of all others similarly | § | |
| situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | No. B-00-082 |
| CIBA-GEIGY Corp. USA, | § | |
| Novartis Pharmaceuticals Corp., | § | |
| Children and Adults with | § | |
| Attention-Deficit/Hyperactivity | § | |
| Disorder (CHADD), | § | |
| American Psychiatric Association, | § | |
| Defendants. | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' RENEWED MOTIONS TO DISMISS

Come now plaintiffs and file this their Response to the renewed Motions to

Dismiss brought by the defendants Novartis Pharmaceuticals Corporation ("Novartis"),

the American Psychiatric Association ("APA"), and Children and Adults with Attention-

Deficit/Hyperactivity Disorder ("CHADD"), (collectively referred to as "Defendants"),

and would respectfully show as follows:

### INTRODUCTION

This case comprises claims on behalf of a class of purchasers of the drug Ritalin.

The named plaintiffs, Texas parents of children who have taken Ritalin, state claims for

fraud, negligent failure to warn, conspiracy, and claims under the New Jersey Consumer

Fraud Act. Defendants filed motions to dismiss plaintiffs' claims under Fed.R.Civ.Proc.

1

Rules 9(b).  In its Memorandum Opinion and Order of October 17, 2000 (the

Memorandum"), the Court granted these motions in part, and ordered plaintiffs to replead

their allegations by November 17, 2000.  Plaintiffs timely filed their First Amended

Complaint (the "Amended Complaint").

Defendants have since filed renewed motions to dismiss under Rules 9(b) and

12b(6).  As detailed below, Defendants are not entitled to dismissal because plaintiffs'

Amended Complaint complies with Rule 9(b) and with the Court's October 17th Order,

and adequately states claims upon which relief may be granted.  In the alternative,

plaintiffs respectfully request leave to file a further amended complaint which is attached

to this Response for the Court's review.

## ARGUMENT AND AUTHORITIES

I.       Standard for Disposition of Defendants' 9(b) Motions

The Federal Rules of Civil Procedure generally require only a "short and plain

statement" of a plaintiff's claim.  Rule 8(a).  This rule and Rule 9(b) are complimentary,"

and "must be read in that fashion, avoiding an exclusive focusing on the requirements of

one or the other."  Frith v. Guardian Life Ins. Co., 9 F.Supp. 2d 734, 742 (S.D. Tex.

1998), quoting Mitchell Energy Corp. v. Martin, 616 F.Supp. 924, 927 (S.D. Tex. 1985);

see also Corwin v. Marney, Orton Investments, Inc., 788 F.2d 1063, 1068 n. 4 (5th Cir.

1986).  As Professors Wright and Miller have stated, "it is inappropriate to focus

exclusively on the fact that Rule 9(b) requires particularity in pleading fraud.  This is too

narrow an approach and fails to take account of the general simplicity and flexibility

required by the rules ....[N]either Rule 8 nor Rule 9(b) requires fact pleading."  5 Wright

and Miller, supra, § 1298 (West 1990).  Finally, when evaluating plaintiffs' claims under

2

CMPDF - www.fesite.com

this standard, the Court must accept all of plaintiffs' factual allegations as true.  Guidry v.

Bank of La Place, 954 F.2d 278, 28 (5th Cir. 1992).

In its Memorandum, the Court quoted Frith, supra, for the rule that "the focus of a

Rule 9(b) inquiry should be whether, given the nature and facts of the case and the

circumstances of the parties, the pleading in question is sufficiently particular to satisfy

the purposes of Rule 9(b)." 9 F.Supp.2d at 742;  Memorandum at 9.  Assessing the true

level of particularity required by Rule 9(b) in this case, the Court held as follows:

> Perhaps the most basic consideration in making a judgment as to the
> sufficiency of a pleading is the determination of how much detail is
> necessary to give adequate notice to an adverse party and enable him to
> prepare a responsive pleading." Wright & Miller, FEDERAL PRACTICE
> & PROCEDURE § 1298.  Therefore, when a cause of action grounded in
> fraud is based on complicated or lengthy occurrences, courts tend to be
> less exacting.  See e.g. U.S. ex rel. Johnson, 183 F.R.D. at 208;  Wright &
> Miller, FEDERAL PRACTICE & PROCEDURE §1298.  Moreover, the
> plaintiff may plead fraud upon information and belief if the facts required
> to satisfy Rule 9(b) are within the defendant's knowledge and control, and
> the plaintiff can provide adequate support for his or her allegations.  See
> United States ex rel. Thompson, 20 F.Supp.2d at 1039;  United States ex.
> Rel. Thompson, 125 F.3d at 903 (quoting Tuchman, 14 F.3d at 1068);
> Wright & Miller, FEDERAL PRACTICE & PROCEDURE §1298.
>
> Many, if not most, recent Fifth Circuit cases that explain the level of
> specificity required by Rule 9(b) are based on Racketeer Influenced and
> Corrupt Organizations Act (RICO) and securities fraud causes of action.
> These cases strictly apply the heightened pleading standards of Rule 9(b).
> While these cases provide important guidance as to the requirements of
> Rule 9(b), the Court recognizes that they require a level of specificity that
> may not apply to the particular facts of this case in every respect.

Memorandum at 9-10 (footnotes omitted).  Plaintiffs respectfully submit that they

have met this standard.

II.    PLAINTIFFS' FIRST AMENDED COMPLAINT COMPLIES WITH
       THE COURT'S ORDER AND SATISFIES RULE 9(b)

3

As plaintiffs acknowledged in response to Defendants' first set of motions to

dismiss, in the oral hearing and at pp. 7-8 of their Amended Complaint, they cannot recite

"the particulars of every misstatement, misrepresentation or omission made by

defendants." Despite the Defendants' obvious preference that the plaintiffs be required to

meet this impossible burden, neither Rule 9(b) nor the Court's Order require plaintiffs'

pleadings to meet this exacting standard on the facts of this case. The Amended

Complaint, however, complies with the Court's Order, and clearly satisfies the letter and

purpose of Rule 9(b), and the Defendants, therefore, are not entitled to dismissal.

First, plaintiffs have complied with the Court's instructions concerning specific

pleading matters. As ordered at p. 3 of the Memorandum, plaintiffs have specifically

enumerated the allegations against each defendant. See Amended Complaint at 8

("Allegations against Defendant Novartis), 11 ("Allegations against Defendant American

Psychiatric Association"), and 12 ("Allegations against Defendant CHADD"). Plaintiffs

have also set forth specific allegations concerning each named plaintiff, as directed at p. 4

of the Memorandum. See Amended Complaint 4-5.

Second, plaintiffs have amplified and clarified their allegations against each

defendant. At pp. 6-8 of the Amended Complaint, there is a "General Statement of

Allegations." This section's first sentence states straightforwardly that "[t]his suit

concerns the criteria used to reach a diagnosis of ADD/ADHD, the failure to warn of

serious side effects associated with Ritalin use, and the failure to acknowledge and

disclose that Ritalin does not improve long-term scholastic performance." The Amended

Complaint then proceeds through a detailed recitation of factual allegations against each

defendant. Paragraph 27, concerning defendant APA, is typical. It reads as follows:

> The members of the American Psychiatric Association who prescribed Ritalin have an immense financial stake in its use. Each prescription requires a monthly doctor's visit, even if the child has been on Ritalin for years. Because of the tremendous financial self-interest on the part of its members, the APA has deliberately broadened the diagnostic criteria for ADD/ADHD in the successive editions of the DSM. The criteria are now so numerous, and so subjective, that virtually any normal child could be diagnosed with ADHD, and literally every child who displays any of a number of normal childhood behavior could be so diagnosed.

This paragraph sets out the motive plaintiffs allege to be behind APA's actions; the actions taken by APA, and APA's concerted action with its codefendant Novartis. Similarly, paragraph 31 sets out detailed factual allegations of motive and action against CHADD, and paragraph 23 does the same for Novartis. These paragraphs are merely examples and are not unique.

It is further worth noting the Court's observation that "Official Form 13 in the appendix of the Federal Rules of Civil Procedure illustrates that the requirements of Rule 9(b) can be met in a few sentences." Memorandum p.9, fn. 7. In fact, the complaint that appears in an example in Form 13 contains *one sentence* of substantive allegations of fraud. The allegations set out in Plaintiffs' Amended Complaint certainly meet the 9(b) pleading standard exemplified in Form 13. More importantly, the plaintiffs' allegations meet the pleading standard that is appropriate to the complicated and lengthy nature and facts of this case.

Defendants may not agree with plaintiffs' allegations, but it cannot be said that, as a matter of law, the plaintiffs' Amended Complaint does not fairly and adequately put the Defendants on notice of the Plaintiffs' allegations against them – the sole purpose of Rule 9(b). As such, the Amended Complaint clearly meets the requirements of Rule 9(b), and the Defendants' motions to dismiss based on Rule 9(b) are without merit.

III.   PLAINTIFFS' FIRST AMENDED COMPLAINT ADEQUATELY
       STATES CLAIMS UPON WHICH RELIEF CAN BE GRANTED

In answer to the Court's concern expressed in its Memorandum at p. 4 that, "[i]t is unclear whether the named plaintiffs allege that their children were prescribed Ritalin when they had no medical need for the drug, or whether there was a legitimate medical need for the prescription but they were not warned of side effects or the limited efficacy of the drug [,]" plaintiffs submit that the Amended Complaint makes clear that the plaintiffs believe they had no medical need for the prescription.  In addition, it is also the case, and it is plainly alleged, that plaintiffs were not warned of serious side effects and of Ritalin's limited efficacy.

Further, Novartis is not entitled to a dismissal because the Amended Complaint "does not identify a single statement in the DSM that it claims is false."  Plaintiffs do not allege that statements in the DSM are "false"; rather plaintiffs contend the diagnosis criteria in the DSM are deliberately overbroad and subjective - designed to lead to far too many diagnoses and Ritalin prescriptions.  These allegations are stated plainly and straightforwardly.  See Amended Complaint paragraphs 13, 14, 18, 20, 21, 27, 28, 29, 30, and 43.

Defendants Novartis and APA also wrongly assert that plaintiffs must specifically allege whether, in fact, their children have AD/HD.  See Novartis memorandum at 12; APA memorandum at 5, 8-9.  The plaintiffs' children, of course, were said to "have" AD/HD in the only sense in which they could be said to have it -- there is no biological or physical test for AD/HD. A "diagnosis" of AD/HD relies only on a subjective pronouncement that, because a child's particular behavior may be said to fall somewhere in the panorama of largely unremarkable childhood behavior generally described by the

CVISPDF - www.fesiro.com

DSM, they must "have" the condition. It is part and parcel of the plaintiffs' complaint

that the diagnostic criteria contrived by Defendants Novartis and APA and advanced by

all Defendants, deliberately fail to distinguish between those who could arguably be said

to have any medical need for Ritalin and those that do not, creating inherently unreliable

AD/HD diagnoses. These unreliable, but lucrative, diagnoses of AD/HD are intended to,

and virtually always do, lead to the equally unreliable recommendations of drugging

children such as the plaintiffs' children with the dangerous, but highly profitable, narcotic

Ritalin.

Accordingly, the Amended Complaint sets out the required facts:

> Miguel Hernandez was diagnosed with ADHD in approximately September, 1995. His parents reviewed literature published by defendant CHADD and paid for by defendant Novartis and considered the representations found therein in accepting the diagnosis and agreeing to a prescription of Ritalin.

> The Hernandez family would not have accepted the diagnosis, nor would it have permitted the prescription and drugging of young Miguel, had it known the extremely subjective and broad nature of its criteria. As a result of the actions of these defendants, Miguel Hernandez took the drug Ritalin, as prescribed, from 1995 until June, 2000.

Amended Complaint at 4.

Further, despite Defendant Novartis' erroneous claim to the contrary, the

allegation as to Ms. Butler's child is the same as that set out above, except that she did

not review CHADD literature, and her child took Ritalin from 1997 until May 2000. The

Amended Complaint, however, makes clear that these parents, including Plaintiff Butler,

relied on the diagnostic conclusion invited by the DSM, and would not have accepted the

"diagnoses" of AD/HD and would not have purchased Ritalin and participated in the

7

drugging of their children with Ritalin if they had known the unsound bases for those diagnoses.

In regard to the sarcastic and gratuitous observation by Novartis that since Miguel Hernandez took Ritalin until June 2000, one month after the original lawsuit was filed, plaintiffs must acknowledge that he needs it, plaintiffs are fully prepared to show that Ritalin is highly addictive in many children, and has been recognized as so by public health bodies, and children can not simply stop taking Ritalin cold turkey. In fact, numerous deaths have been attributed to the abrupt cessation of Ritalin use. To whatever extent the Court should find these facts relevant, plaintiffs will promptly document them for the Court if desired.

Lastly, there is no merit to Defendant CHADD's assertion that it is entitled to dismissal because CHADD had "no duty to advise the plaintiffs of [] [the] side effects [of Ritalin]." CHADD acknowledges in its argument, however, that doctors and manufacturers would have such a duty, then perfunctorily proclaims that, since it is "neither manufacturer nor [] doctor", it is immune from such a duty. CHADD's Brief in Support, p.12. There is no basis in law or logic for CHADD's self-exonerating conclusion.

Plaintiffs have pleaded that CHADD acted as the agent of and on behalf of the manufacturer Novartis in advertising and promoting Ritalin. CHADD's duty to warn, therefore, is no different than that of Novartis as the manufacturer. Moreover, a doctor's duty to warn of the dangers of certain drugs is because the doctor is a "learned intermediary" that "understands the propensities and dangers involved in the use of a given drug." Alm v. Aluminum Co. of America, 717 S.W.2d 588, 592 (Tex. 1986).

Under the facts as pleaded by plaintiffs and described by CHADD's own pleadings, CHADD was clearly an intermediary between Novartis and consumers of Ritalin, and there is no dispute that CHADD understood the propensities and dangers involved in the use of Ritalin. As is also clearly pleaded in plaintiffs' Amended Complaint, CHADD deliberately or negligently advertised and promoted Ritalin, to the exclusion of other similar drugs, without any warning whatsoever about its possible side effects, with the intent to increase its benefactor Defendant Novartis' sales of the drug. CHADD, therefore, assumed a duty to warn of the possible serious side effects of Ritalin when it acted on behalf of Ritalin's manufacturer, Defendant Novartis, or alternatively, when it acted as a learned intermediary, in advertising and promoting Ritalin. Under the facts as pleaded, it simply cannot be asserted that, as a matter of law, CHADD had no duty to warn of the potential side effects of this dangerous drug, and CHADD, therefore, is not entitled to a dismissal from this action.

## CONCLUSION

For all of the above reasons, plaintiffs respectfully submit that defendants' motions to dismiss are without merit and should be denied. In the event that the Court finds the plaintiffs' allegations to be insufficiently pleaded with particularity or fail to state a cause of action, plaintiffs respectfully request leave to replead plaintiffs' allegations in the substance and form of what is attached to this Response and titled Plaintiffs' Second Amended Complaint for Damages and Injunctive Relief.

The proposed Second Amended Complaint is similar to an amended complaint recently sought to be filed by the plaintiffs in a related case in California in which certain of the undersigned plaintiffs' counsel also represent the plaintiffs. In the California

action, the pendency of a threshold dispositive motion on the merits led to plaintiffs'

counsel conducting extensive formal discovery, and to resulting further refinement and

clarification of their allegations.  These allegations are contained in the proposed Second

Amended Complaint.  No further requests for leave to amend will be made by plaintiffs.

PRAYER

WHEREFORE, PREMISES CONSIDERED, plaintiffs pray that defendants

Novartis Pharmaceuticals Corporation's, the American Psychiatric Association's, and

Children and Adults with Attention-Deficit/Hyperactivity Disorder's motions to dismiss

be in all things denied.  In the alternative, plaintiffs pray that they be given a reasonable

opportunity to replead such allegations as the Court finds do not meet the standard of

Fed. R. Civ. Proc. 9(b) or fail to state a claim upon which relief may be granted.

Plaintiffs also request all such other and further relief to which they may be justly entitled

at law or in equity.

Respectfully submitted,

Frank Costilla
State Bar No. 04856500
Federal I.D. 1509
Law Offices of Frank Costilla
5 East Elizabeth Street
Brownsville, Texas  78520
(956) 541-4982
(956) 544-3152 telecopier

WATERS & KRAUS, LLP

*Charles S. Siegel* by permission

Charles S. Siegel
State Bar No. 18341875
Federal I.D. No. 15736
C. Andrew Waters
State Bar No. 20911450
Melissa A. Miles
State Bar No. 90001277
3219 McKinney Avenue,
Suite 3000
Dallas, Texas 75209
(214) 357-6244
(214) 357-7252 telecopier

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served

by facsimile and regular mail to all counsel of record on January 29, 2001:

Earl B. Austin
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-6542
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

James A. O'Neal
Joseph M. Price
Bruce Jones
Faegre & Benson L.L.P.
2200 Norwest Center
90 South Seventh Street
Minneapolis, Minnesota 55404-3901
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

Eduardo Roberto Rodriguez
Mitchell C. Chaney
Rodriguez, Colvin & Chaney, L.L.P.

CMPDF - www.festo.com

1201 East Van Buren
P.O. Box 2155
Brownsville, Texas 78522
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

Robert P. Charrow
Crowell & Moring
1001 Pennsylvania Ave., NW
Washington, DC 20004
Attorneys for American Psychiatric Association

Andrew C. Schirrmeister III
George R. Diaz-Arrastia
Schirrmeister Ajamie, L.L.P.
Pennszoil Place-South Tower
711 Louisiana, 21st Floor
Houston, Texas 77002
Attorneys for American Psychiatric Association

Gerald Zingone
Arent & Fox
1050 Connecticut Ave. N.W.
Washington, DC 20036
Attorneys for Children and Adults with Attention-Deficit/Hyperactivity Disorder
(CHADD)

Tom A. Lockhart
Adams & Graham, L.L.P.
222 East Van Buren, West Tower
Harlingen, Texas 78550
Attorneys for Children and Adults with Attention-Deficit/Hyperactivity Disorder
(CHADD)

Melissa A. Miles
by permission

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| Maria Elena Hernandez, Miguel Angel | § | |
| Hernandez, Heather Butler, individually and | § | |
| On behalf of all others similarly situated | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| | § | |
| Ciba-Geigy Corporation, U.S.A., | § | |
| Novartis Pharmaceuticals Corporation, | § | |
| Children and Adults with Attention, | § | |
| Hyperactivity Deficit Disorder (CHADD), | § | No. B-00-082 |
| American Psychiatric Association (APA), | § | |
| Defendants. | § | |

**PLAINTIFFS' SECOND AMENDED COMPLAINT
FOR DAMAGES AND INJUNCTIVE RELIEF**

Come now plaintiffs, Maria Elena Hernandez, Miguel Angel Hernandez, and

Heather Butler, individually and on behalf of all others similarly situated as defined

below, and file this their second amended complaint for damages and injunctive relief

and would respectfully show as follows:

I.      PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs Maria Elena Hernandez, Miguel Angel Hernandez and Heather

Butler are residents of Texas.  They are purchasers of

the drug Ritalin for the use of their children.

1

2.      Defendant CIBA-GEIGY CORP., USA is a corporation with its principal place of business in New Jersey.  It has been served in this action and need not be formally served with process.

3.      Defendant NOVARTIS PHARMACEUTICALS CORP. is a corporation with its principal place of business in New Jersey.  It has been served in this action and need not formally be served with process.

4.      Defendant CHILDREN AND ADULTS WITH ATTENTION-DEFICIT/HYPERACTIVITY DISORDER (CHADD) is a corporation with its principal office in Maryland.  It has filed a responsive pleading in this action, and/or has been served, and need not formally be served with process.

5.      Defendant AMERICAN PSYCHIATRIC ASSOCIATION is a corporation with its principal office in Washington, D.C.  It has been served in this action and need not formally be served with process.

6.      This case was filed originally in state court, and removed to this Court on the basis of diversity jurisdiction.  Venue is proper in this Court because all or a substantial part of the events giving rise to the claim occurred in this district, and because one or more of the defendants transact business in this district.

2

## II.    FACTUAL BACKGROUND

7.    Ritalin is a psychostimulant drug.  It is the trade name for a
pharmacological substance known as methylphenidate.  Methylphenidate,
and therefore Ritalin, are "Class II" or "Schedule II" controlled substances
under the Controlled Substances Act.   See 21 U.S.C. §812;  21 C.F.R.
§1308.12.

8.    From approximately 1955 through 1995, the exclusive or primary
manufacturer and supplier of Ritalin in this country was defendant Ciba-
Geiby Corp., USA ("Ciba").  In 1996, Ciba merged with Sandoz
Pharmaceuticals Corp. to become defendant Novartis Pharmaceuticals
Corp. ("Novartis").  Upon information and belief, Novartis is presently,
and has been since 1996, the sole or primary manufacturer and supplier of
Ritalin in the United States.  Novartis has admitted in this action that it is
the successor to Ciba for all relevant purposes.  Novartis and Ciba will be
referred to collectively in this complaint as "Novartis."

9.    Novartis has manufactured, marketed and sold Ritalin since approximately
1955.  The product was promoted, beginning in the 1960's, by Novartis as
an antidepressant "which brightens moods and improves performance."
Defendant also claimed effectiveness for depression, chronic fatigue and
psychoneurosis.  From 1955 until the late 1970's, Novartis aggressively
sought applications and markets for Ritalin in an effort to boost sales and
profits.

3

10. Today, 90% of all Ritalin prescriptions for ADD/ADHD are written in the United States. Almost twenty percent of all teenage boys in the United States are receiving psychostimulant medication, with Ritalin clearly the leader in use among all such drugs. In all, at least six million American children are taking Ritalin regularly. Many prescriptions are written for children under five years of age. From 1990 through 1997, production of Ritalin in the United States rose several hundred percent.

## III.    FACTUAL BACKGROUND TO NAMED PLAINTIFFS' CLAIMS

11. Maria and Miguel Hernandez are the parents of Miguel (Michael) Hernandez. Miguel Hernandez was diagnosed with ADHD in approximately September, 1995. His parents reviewed literature published by defendant CHADD and paid for by defendant Novartis and considered the representations found therein in accepting the diagnosis and agreeing to a prescription of Ritalin. The Hernandez family would not have accepted the diagnosis, nor would it have permitted the prescription and drugging of young Miguel, had it known the financial relationships and connections among CHADD and Novartis and the American Psychiatric Association. Nor would the Hernandez family have accepted the diagnosis had they known the extremely subjective and broad nature of its criteria. As a result of the actions of these defendants, Miguel Hernandez took the drug Ritalin, as prescribed, from 1995 until June, 2000. As a result, the family has expended certain sums of money for the drug Ritalin

4

that it would not have spent had it known the true nature of the fraudulent

misrepresentations and the acts of conspiracy between the defendants.

12.    Heather Butler is the mother of Dakota Butler.  Dakota Butler was

diagnosed with ADHD in approximately the late fall of 1997.  Heather

Butler has not reviewed literature published by defendant CHADD and

paid for by defendant Novartis.  Ms. Butler was unaware of the

relationship and financial connections among CHADD, the American

Psychiatric Association, and Novartis.  However, Ms. Butler would not

have accepted the diagnosis, nor would she have permitted the drugging of

young Dakota, had she known the relationship and financial connections

among CHADD and Novartis and the nature of the relationship between

the American Psychiatric Association or the extremely subjective and

broad nature of the diagnostic criteria.  As a result of the actions of these

defendants, Dakota Butler took the drug Ritalin, as prescribed from 1997

until May, 2000.  As a result, the family has expended certain sums of

money for the drug Ritalin that it would not have spent had it known the

true nature of the fraudulent misrepresentations and the acts of conspiracy

between the defendants.

IV.    GENERAL STATEMENT OF ALLEGATIONS

13.    This suit concerns the criteria used to reach a diagnosis of ADD/ADHD,

the failure to warn of serious side effects associated with Ritalin use, and

the failure to acknowledge and disclose that Ritalin does not improve

long-term scholastic performance.

5

14.   Ciba/Novartis, in combination with the American Psychiatric Association (APA), planned, conspired, and colluded to develop, promote, broaden and confirm the diagnoses of Attention Deficit Disorder (ADD) and Attention Deficit Hyperactivity Disorder (ADHD) in a highly successful effort to increase the market for its product Ritalin.  Previously recognized in a much more narrow fashion and under another name, Attention Deficit Disorder was first listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM) in 1980.  ADD was further and inappropriately broadened in 1987 when it became known as ADHD.

15.   Ciba/Novartis and APA maintained financial relationships, either directly, or through agency of members of the relevant committees that constructed the DSM criteria for ADD and ADHD  These relationships and their nature were not disclosed to the class.

16.   The DSM is currently and has been a widely used and disseminated compendium of  psychiatric diagnoses.  Listing of a diagnosis in the DSM provides an official-seeming, medical imprimatur to a particular set of symptoms or behaviors that may, in fact, be entirely normal.  A new official diagnosis in the DSM, however, generates vast numbers of new prescriptions, increased insurance coverage, and great public attention.

17.   The third edition of the DSM was published in 1980. The hallmark of this endeavor was the alleged scientific basis for the diagnoses and the criteria by which those diagnoses were to be made.

6

18. As the DSM definitions were promulgated, publicized and progressively reformulated to ever broaden the characterization of ADD/ADHD, there has been a corresponding rise in the use of Ritalin. Such use has damaged the class economically, physically and emotionally. *The Agency for Health Care Policy and Research (AHCPR)* in its Technical Report Number 3 referenced DSM III and DSM III-R as a "significant contributor" to the increased diagnosis rates of ADHD. One study in Germany has shown an increase of almost 100% in the prevalence of ADD and ADHD between the promulgation of DSM-III and DSM-IV. That is, under the much more expansive and subjective criteria in the DSM-IV, almost twice as many children are being diagnosed with ADD/ADHD. Many of these children are treated, frequently for years at a time, with Ritalin.

19. In 1998, a "consensus conference" including members of the medical profession, the pharmaceutical industry, academia and government was convened to address ADD/ADHD and its treatment. The "Consensus Statement" released after this conference included the following statement of concern: "The existing diagnostic and treatment packages, in combination with the potential risks associated with medication, point to the need for improved awareness by the health service sector concerning an appropriate assessment, treatment and followup. A more consistent set of diagnostic procedures and factor guidelines is of utmost importance.

7

20.     Because it is in their own substantial financial self-interest, defendants Novartis and APA have worked together to expand the diagnostic criteria for ADD/ADHD, which criteria are published in the DSM.  As noted above, more diagnoses mean more Ritalin sales for Novartis and more office visits for APA members.  Some APA members' practices are devoted substantially to prescribing Ritalin.

21.     Because of the self-interested actions of these defendants, ADD/ADHD diagnoses and Ritalin prescriptions in the United States have skyrocketed.

22.     Only the internal files of Novartis and APA can fully show their cooperation in this regard.  However, based on information and belief, plaintiffs expect to show that Novartis gave lavish financial support to APA -- a supposedly disinterested, independent professional body -- to induce APA to broaden the DSM criteria.  Plaintiffs also will show that APA invited Novartis, through its agents or representatives, to participate in the drafting of some of these criteria.

23.     Plaintiffs will also show that Novartis has deliberately or negligently failed to warn of serious side effects associated with Ritalin, and has similarly deliberately or negligently failed to disclose the lack of any proof that Ritalin improves long-term scholastic performance.

24.     Since merits discovery in this case has not taken place, plaintiffs are unable to recite in this complaint the particulars of every misstatement, misrepresentation of omission made by defendants.  Plaintiffs expect to be able to offer substantial proof on these matters after discovery has

concluded. Plaintiffs can and do, however, aver that each defendant has acted deliberately, because defendants' action further their own economic self-interest. For Novartis, this is greater Ritalin sales. For the APA, it is greately increased professional income. For CHADD, it is continued financial support from Novartis.

## V.    ALLEGATIONS AGAINST DEFENDANT NOVARTIS

24.    Novartis, in combination with the American Psychiatric Association (APA), planned, conspired, and colluded to create, develop, promote, and confirm the diagnoses of Attention Deficit Disorder (ADD) and Attention Deficit Hyperactivity Disorder (ADHD), by vastly and needlessly overbroad diagnostic criteria, in a highly successful effort to increase the market for its product Ritalin. Due to the concerted efforts of these parties, Attention Deficit Disorder was first listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM) in 1980. The DSM recognized ADHD as a "diagnosis" in 1987.

25.    In addition to its actions and involvement with the creation of the ADD and ADHD diagnoses, upon information and belief, Novartis took steps to promote and dramatically increase the sales of Ritalin by way of the following:

1.    Actively promoting and supporting the concept that a significant percentage of children suffer from a "disease" which required narcotic treatment/therapy;

9

2.    Actively promoting Ritalin as the "drug of choice" to treat children diagnosed with ADD and ADHD;

3.    Actively supporting groups such as Defendant CHADD, both financially and with other means, so that such organizations would promote and support (as a supposed neutral party) the ever - increasing implementation of the ADD/ADHD diagnosis as well as directly increasing Ritalin sales;

4.    Distributing misleading sales and promotional literature to parents, schools and other interested persons in a successful effort to further increase the number of diagnoses and the number of persons prescribed Ritalin.

26.    Novartis deliberately, willfully, intentionally, and/or negligently promoted the diagnosis of ADD/ADHD and sales of Ritalin through its promotional literature and through its training of sales representatives. In so doing, despite knowledge of such problems and/or adverse reactions, Defendants willfully or negligently failed to warn consumers, doctors, and/or schools concerning the many significant hazards of methylphenidate use and prescription, including but not limited to the following:

1.    Cardiovascular problems, including palpitations, tachycardia, hypertension, arrythmias, chest pain and cardiac arrest;

2.    Central nervous system problems, including psychosis with hallucinations, excessive brain stimulation (convulsions),

10

drowsiness, confusion, insomnia, agitation, anxiety, irritability, nervousness, dysphoria, impaired cognitive test performance, dyskinesias, depression, and zombie-like constriction of affect and spontaneity;

3.     Gastrointestinal problems, including anorexia, nausea, vomiting, stomach ailments, dry mouth, and constipation; and

4.     Pituitary dysfunction, including growth hormone and prolactin disruption, weight loss, growth suppression, growth retardation, anemia, exfoliate dermatitis, leukopenia, etc.

27.    Despite information in the medical and scientific literature concerning these side effects of Ritalin use, Defendants failed in all respects to advise potential consumers, doctors, and/or schools, teachers or other interested parties of the nature and extent of such side effects.

28.    In addition, Novartis continuously misrepresented to the consuming public, physicians and other interested parties, the efficacy of the drug Ritalin, without ever advising such persons that Ritalin usage would not improve academic performance and/or have any long term effect on the symptoms associated with ADD and/or ADHD.

29.    Novartis, while listing side effects on its package insert, has failed to warn that the full range of side effects has not yet been adequately studied. It is noted by the AHCPR Technical Report Number 11 that "Studies are required to assess the severity of most adverse effects associated with stimulant medication and to evaluate, explicitly, the tradeoff between

11

improvement in ADHD symptoms and signs and adverse effects." and
"However, data are inadequate on the long-term effects and severity of the
adverse effects of most interventions. No comparative studies were
identified with data on important adverse effects of interest, including
potential for abuse of stimulants . . ."

30.     Novartis failed to disclose the limited effectiveness of its product and
misled clinicians and the public to believe that Ritalin would improve
academic performance and long-term outcomes in those who took Ritalin
and that improvement may be in spite of taking medication.  The AHCPR
Technical Report Number 11 notes: "These studies show a trend to
general improvement over time regardless of treatment and support the
need for long-term placebo-controlled studies. MPH appears to reduce
behavioral disturbance in ADHD children as long as it is taken. However,
there is no information on the reasons so many children discontinue
medication. The studies available provide little evidence for improvement
in academic performance with stimulants, even though MPH treatment
appears to produce consistent behavior improvement."

## VI.     ALLEGATIONS AGAINST DEFENDANT AMERICAN PSYCHIATRIC ASSOCIATION

31.     The members of the American Psychiatric Association who prescribed
Ritalin have an immense financial stake in its use.  Each prescription
requires a monthly doctor's visit, even if the child has been on Ritalin for

12

years. Because of the tremendous financial self-interest on the part of its members, the APA has deliberately broadened the diagnostic criteria for ADD/ADHD in the successive editions of the DSM. The criteria are now so numerous and so subjective, that virtually any normal child could be diagnosed with ADHD, and literally every child who displays any of a number of normal childhood behaviour could be so diagnosed.

Upon information and belief, the APA has allowed representatives, employees or agents of Novartis to participate in the drafting and establishment of DSM diagnostic criteria. This is because Novartis has given lavish financial support to APA, and continues to give such support.

32. In 1980, the APA published a new diagnostic manual called the Diagnostic and Statistical Manual, 3d edition. The hallmark of this endeavor was the alleged scientific basis for the diagnoses and the criteria by which those diagnoses were to be made.

33. Although the manual set forth standards by which the diagnostic criteria were to be judged as valid and therefore included in the manual, the diagnosis of ADD was included in the manual despite failing to meet those standards. In so doing, the APA fraudulently and falsely claimed and represented that the diagnostic criteria for ADD was scientifically reliable.

34. In an effort to cover up this fraud, the APA improperly clustered the data from tests of the ADD diagnostic criteria with data supporting other unrelated conditions whose reliability was established. The intended and ultimate effect of such improper clustering was to inappropriately legitimize the unproven and arbitrary ADD diagnostic criteria.

13

35. In addition to the above, the APA also purposefully and fraudulently failed to include the use of any objective criteria in the creation and promulgation of the ADD diagnostic criteria (despite there being overwhelming evidence supporting the inclusion of the same).

36. In presenting the criteria in the guise of a scientific endeavor, APA misrepresented a fundamentally arbitrary set of criteria as a scientifically validated diagnostic set, misleading both clinicians, patients, the general public, and the class.

37. These efforts by the APA, to improperly expand the diagnostic criteria for ADD are revealed in the current version of the DSM, the DSM IV-TR. In it, for example, the APA added the diagnosis of ADHD "not otherwise specified" which allows for the diagnosis to be imposed on those who even fail to meet the general criteria.

38. The inappropriate vagueness and breadth of the diagnostic criteria for ADD and ADHD has been critically noted by the American Academy of Pediatrics that, in a paper produced in connection with their 2000 annual meeting specifically referred to the "lack of definitive diagnostic criteria." Likewise, the NIH (National Institutes of Health) in Consensus Development Conference Statement #58, noted that "an important research need is the investigation of standardized age and gender specific diagnostic criteria."

39. In addition, in versions of the DSM after DSMIII –R, the pretense of field testing was eliminated, and the lack of objective measures was improperly continued.

40. From the inception of the DSM, the APA has improperly failed to address or include dissenting opinion and failed to fully address or actually

14

obscured the scientific literature that advances the position that the
diagnosis of ADD is properly made only as a diagnosis of exclusion, a
view emphasized by the American Academy of Child and Adolescent
Psychiatry in their 1997 practice parameters for the diagnosis of ADHD
which prominently states: "By definition, the diagnosis of ADHD cannot
be made if the symptoms occur exclusively in the presence of a pervasive
developmental disorder, schizophrenia, or other psychotic disorder or if
they are better accounted for by another psychiatric disorder." This view is
similarly shared by the AMA in its Council of Scientific Affairs, Report
5, which says: "The goals of the actual examination of the child are to
determine whether he or she meets the diagnostic criteria and to look for
conditions other than ADHD that might simulate it."

41.     In all editions of DSM and since the inception of the DSM, the APA has
fraudulently failed to disclose, through misrepresentations and omissions,
the role of the drug industry and, in particular, Novartis, in the creation,
promulgation and revisions of the DSM or the financial connection
between its committee members and Novartis.

42.     Such a connection is clearly present. One need only review the November
17, 2000 issue of Psychiatric News, the official publication of the APA,
and in particular a statement by its current president who decries the
APA's dependence upon the drug industry stating "[The] APA is overly-
dependent on pharmaceutical companies. Approximately one third of
APA's income is derived from the pharmaceutical industry." Further,
direct solicitations from the APA to drug companies have been customary.

15

43.   Reflecting this connection, Defendant APA has aided, abetted and
promoted the concept of Ritalin therapy for treatment of the vast numbers
of children who began to be diagnosed with ADD and ADHD, pursuant to
the APA's recommendations and support for the diagnosis.

On multiple occasions, officials and committee members of APA actually
requested medical input from employees or contractor of Novartis,
inviting them to participate in the drafting and establishment of DSM
criteria.  The interrelationship between Novartis and the APA contributed
to the creation of extremely broad and subjective diagnostic criteria that
could be, and ultimately were, applied to a large percentage of children in
the United States, and for which the APA, in combination with other
defendants, continued and presently continue to promote the prescription,
use, and sale of Ritalin.

44.   APA failed to disclose that although the DSM in its various editions refers
to much clinical literature on ADD/ADHD, almost all of this research is of
poor quality.  The AHCPR Technical Report Number 11 notes: "The small
sample size of most studies limited their power to detect meaningful
clinically important differences among the interventions. Ninety-seven
percent of the reports of RCTs did not describe the method of
randomization. Ninety-five percent did not describe efforts to conceal
allocation from the investigators who recruited the patients into the study
(e.g., allocation codes were obtained by telephone after a patient accepted
to enter the study). Eighty-seven percent did not describe the number of

16

withdrawals and dropouts and the reasons for such in each of the groups. These limitations increased the likelihood of biased results."

## VII.   ALLEGATIONS AGAINST DEFENDANT CHADD

45.   Defendant CHADD (Children and Adults with Attention-Deficit/Hyperactivity Disorder) is an unincorporated association dedicated and promoted to the principle that significant numbers of persons suffer from ADHD, as broadly overdefined in the DSM.  CHADD works closely with Novartis and the American Psychiatric Association.

46.   Based on information and belief, CHADD has been a recipient of financial donations and contributions from Defendants Novartis for many years. CHADD received $748,000 from Novartis in the period 1991 to 1994 alone.  During the periods when CHADD received funding from Novartis, CHADD deliberately made efforts to increase the sales of Ritalin, to increase the supply of methylphenidate available in the United States, and to reduce or eliminate laws and restrictions concerning the use of Ritalin and methylphenidate in the United States, all at the request, and to the financial benefit of Novartis.  In particular, CHADD lobbied for changing methiylphenidate from a "Class 2" substance to a "Class 3" substance, a change which would have resulted in a direct, substantial financial benefit to Novartis.

47.   Significantly, CHADD's literature has used the brand name Ritalin, as opposed to the generic term methylphenidate, in seeking to persuade parents of the benefits of psychostimulant medication.  According to the

17

Drug Enforcement Administration, "The relationship between Ciba-Geigy and CHADD raises serious concerns about CHADD's motive in proselytizing the use of Ritalin through the use of the brand name as opposes to the generic name methylphenidate in its literature." (DEA Press Release, Oct. 25, 1995, p. 15).

48.  Novartis made such financial contributions with the purpose of advertising and promoting sales of Ritalin - an internationally controlled substance. Novartis has thus repeatedly violated Article 10 of the United Nations Convention on Psychotropic Substances, 1019 U.N.T.S. 175 (1971).

49.  CHADD's activities nationwide have led to a significant increase in the amount of Ritalin taken by school children and have directly resulted in enormous profits to Novartis.  In so doing, CHADD has promoted the concept of a diagnosis of "disease" or "brain damage" as well as promoting and supporting the concept that appropriate therapy for such a diagnosis is a prescription for Ritalin.  In so doing, CHADD has acted as an agent of, and/or has aided and abetted Novartis in its efforts to increase sales and earn additional profits from the sale of Ritalin.

50.  Defendant CHADD (Children and Adults with Attention-Deficit/Hyperactivity Disorder) is an unincorporated association formed in 1987 with a stated purpose of "representing individuals with AD/HD, for education, advocacy and support."  On its website, it alleges to be "the leading non-profit organization for children and adults with AD/HD;" and

18

notes that it is continue[d] to be run by volunteers, with the support of a small national staff."

51. Nowhere in its website does CHADD reveal that it has received significant if not life sustaining contributions from Novartis. For example, CHADD does not disclose that it received $748,000 from Novartis in the period 1991 to 1994 alone.

52. Novartis made such financial contributions with the purpose of advertising and promoting sales of Ritalin - an internationally controlled substance. Ciba/Novartis has thus repeatedly violated Article 10 of the United Nations Convention on Psychotropic Substances, 1019 U.N.T.S. 175 (1971).

53. CHADD's activities nationwide have led to a significant increase in the amount of Ritalin taken by school children and have directly resulted in enormous profits to Ciba/Novartis. In so doing, CHADD has damaged the class by over promoting a drug where none was needed. In so doing, CHADD has acted as an agent of, and/or has aided and abetted Ciba/Novartis in its efforts to increase sales and earn additional profits from the sale of Ritalin.

## VIII.  CAUSES OF ACTION
### FRAUD AND NEGLIGENT FAILURE TO WARN

54. All of plaintiffs' previous allegations are incorporated herein by reference as if realleged in full.

55. For many years, all Defendants have made fraudulent misrepresentations to the public, the scientific community and the media concerning the scope

19

and extent of ADD and ADHD.  These misrepresentations were made as statements of scientific fact, but were known by defendants to be untrue.

56.    In the alternative, defendants made these statements recklessly and without ascertaining their truth.

57.    In the alternative, Novartis negligently failed to warn of the side effects of Ritalin, and its lack of efficacy, detailed above.

58.    Members of the public, including parents, other caregivers, educators and medical professionals, relied on these statements and the warnings that were given, albeit inadequately.  This reliance was known, anticipated, intended and induced by defendants.

59.    The named plaintiffs and others similarly situated relied on these misrepresentations and lack of warnings to their detriment by making needless purchases of Ritalin, which they would not have made but for defendants' misrepresentations and inadequate warnings.

IX.   CONSPIRACY

60.    All of plaintiffs' previous allegations are incorporated herein by reference as if realleged in full.

61.    All defendants conspired, combined and colluded to promote and dramatically increase the sales of Ritalin by way of the following:

1.    Actively promoting and supporting the concept that a significant percentage of children suffer from a "disease" which required narcotic treatment/therapy;

20

2.     Campaigning for treatment of ADHD as a disability, thus resulting in a great financial incentive for schools to seek or impel diagnoses of children with ADHD.

3.     Actively promoting Ritalin as the "drug of choice" to treat children diagnosed with ADD and ADHD;

4.     Distributing misleading sales and promotional literature to parents, schools and other interested persons in a successful effort to further increase the number of diagnoses and the number of persons prescribed Ritalin.

5.     Deliberately neglecting to address or provide adequate information to consumers, doctors, and/or schools concerning the many significant hazards of methylphenidate use and prescription, including but not limited to the following:

a.     Cardiovascular problems, including palpitations, tachycardia, hypertension, arrythmias, chest pain and cardiac arrest;

b.     Central nervous system problems, including psychosis with hallucinations, excessive brain stimulation (convulsions), drowsiness, confusion, insomnia, agitation, anxiety, irritability, nervousness, dysphoria, impaired cognitive test performance, dyskinesias, depression, and zombie-like constriction of affect and spontaneity;

21

      c.       Gastrointestinal problems, including anorexia, nausea, vomiting, stomach ailments, dry mouth, and constipation;

      d.       Pituitary dysfunction, including growth hormone and prolactin disruption, weight loss, growth suppression, growth retardation, anemia, exfoliate dermatitis, leukopenia, etc.

6.      Misrepresenting to the consuming public, physicians and other interested parties, the efficacy of the drug Ritalin, without ever advising such persons that Ritalin usage would not stimulate or improve academic performance and/or have any long term effect on the symptoms associated with ADD and/or ADHD.

7.      Facilitating the creation of new diagnoses in the DSM, made by reference to overbroad and overly subjective criteria.

## X.  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT

62.      Novartis is headquartered in New Jersey.  The acts and omissions complained of in this case took place, in substantial part, in New Jersey, and/or were directed from New Jersey.  The New Jersey Consumer Fraud Act thus applies to these acts and omissions.

22

63.     The New Jersey Consumer Fraud Act is set forth at N.J.S.A. section 56: 8-
        2 et seq.  Section 56: 8-19 affords a civil remedy that can be sought by any
        person damaged under the Act.

64.     Under the Act an unfair and deceptive trade practice includes the sale or
        advertisement of merchandise by any unconscionable commercial
        practice, deception, fraud, false pretense, false promise, misrepresentation,
        or the knowing concealment, suppression, or omission of any material
        fact, with the intent that others will rely upon such concealment,
        suppression and/or omission.

65.     As detailed above, defendants suppressed and concealed their knowledge
        of the potentially harmful and unreasonably dangerous side effects of
        Ritalin, and the lack of need for its use in many cases, with the intent that
        plaintiffs and others similarly situated rely upon their fraudulent
        misrepresentations.  Plaintiff and others similarly situated were unaware of
        the facts which defendants knew but failed to disclose.  In reliance upon
        defendants' acts, omissions and misrepresentations, plaintiffs and others
        similarly situated purchased, and continue to purchase Ritalin.

                    XI.    CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil
        Procedure 23.  The prerequisites for class certification are satisfied for the
        following reasons:

                                        23

The class is so numerous that joinder of all members is impracticable.

Upon information and belief, over six million children are currently using

Ritalin in this country. The class thus easily numbers in the millions.

67.     There are numerous questions of law and fact common to the class. These

include but are not limited to:

*whether defendants' representations have been false, or made without
knowledge of their truth;
*whether defendants intended plaintiff and other similarly situated to rely
upon these representations;
*whether plaintiff and other similarly situated in fact did rely on these
representations;
*whether defendants conspired to increase the amount of Ritalin
prescriptions and sales;
*whether the New Jersey Consumer Fraud Act applies to the acts and
omissions in this case and affords a remedy to all class members;
*the defendants state of knowledge concerning the potential harms of
Ritalin, the lack of need for its prescription in most cases, and the lack of
knowledge of parents, the general public, medical professionals, and
educators on these subjects.

68.     There is no reason for each of these questions to be litigated in numerous

separate suits. Instead, they should be resolved in one proceeding.

69.     The claims of plaintiffs are typical of the claims of the entire class. There

is no antagonism between plaintiffs and the other members of the class,

and they assert the same claims that other class members could and would

assert. Further, plaintiffs are not subject to any unique defense.

70.     Plaintiffs will fairly and adequately protect the interest of the class. They

have retained counsel who are experienced in product liability and

consumer fraud litigation, and who have substantial experience in class

24

action litigation.  These counsel will vigorously and zealously represent the class.

71.     Defendants have acted on grounds generally applicable to all class members.  The injunctive relief prayed for in this complaint is therefore appropriate for all class members.

72.     The common questions of law and fact set forth above predominate over any questions that affect individual class members.  This class action is therefore superior to any other method available for the fair and efficient adjudication of this controversy; Indeed, no other such method is available.  Moreover, to plaintiffs' knowledge, there is no other litigation concerning this controversy at present.

73.     Plaintiff therefore seeks certification of a class consisting of all persons in the United States and its territories who have purchased Ritalin within the four years proceeding the filing of this complaint, excluding any officers, or employees or their children, of any of the defendants.

## XII.   REMEDIES SOUGHT

74.     As a result of the acts and omissions detailed above, plaintiffs and others similarly situated have been damaged and are entitled to certain legal remedies.  Plaintiffs therefore pray for the following relief, to be awarded to her and all class members upon the certification of the class described above.

75.     Refund of all monies paid to purchase Ritalin within the four years preceding the filing of this complaint;

25

80. Exemplary damages;

81. Treble damages pursuant to the New Jersey Consumer Fraud Act;

82. Injunctive relief in the form of an order permanently enjoining defendants from failing to provide all known information concerning the lack of long-term efficacy of Ritalin, and its adverse short-term and long-term effects, to purchasers, doctors, educators and the general public, and from failing to disclose the history of the establishment of the diagnostic criteria.

83. Reasonable attorneys' fees, expenses, and costs of suit; and

84. Any and all further relief to which plaintiffs and others similarly situated may show themselves justly entitled.

85. Plaintiffs demand a trial by jury of all issues in this action.


Respectfully submitted,

Frank Costilla
State Bar No. 04856500
Federal I.D. 1509
Law Offices of Frank Costilla
5 East Elizabeth Street
Brownsville, Texas 78520
(956) 541-4982
(956) 544-3152 telecopier

26

WATERS & KRAUS, LLP

Charles S. Siegel
State Bar No. 18341875
Federal I.D. No. 15736
C. Andrew Waters
State Bar No. 20911450
Melissa A. Miles
State Bar No. 90001277
3219 McKinney Avenue,
Suite 3000
Dallas, Texas 75209
(214) 357-6244
(214) 357-7252 telecopier

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by facsimile and regular mail to all counsel of record on January 29, 2001.

Earl B. Austin
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-6542
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

James A. O'Neal
Joseph M. Price
Bruce Jones
Faegre & Benson L.L.P.
2200 Norwest Center
90 South Seventh Street
Minneapolis, Minnesota 55404-3901
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

27

Eduardo Roberto Rodriguez
Mitchell C. Chaney
Rodriguez, Colvin & Chaney, L.L.P.
1201 East Van Buren
P.O. Box 2155
Brownsville, Texas 78522
Attorneys for Defendants Ciba-Geigy Corp. USA and Novartis Pharmaceuticals Corp.

Robert P. Charrow
Crowell & Moring
1001 Pennsylvania Ave., NW
Washington, DC 20004
Attorneys for American Psychiatric Association

Andrew C. Schirrmeister III
George R. Diaz-Arrastia
Schirrmeister Ajamie, L.L.P.
Pennszoil Place-South Tower
711 Louisiana, 21st Floor
Houston, Texas 77002
Attorneys for American Psychiatric Association

Gerald Zingone
Arent & Fox
1050 Connecticut Ave. N.W.
Washington, DC 20036
Attorneys for Children and Adults with Attention-Deficit/Hyperactivity Disorder
(CHADD)

Tom A. Lockhart
Adams & Graham, L.L.P.
222 East Van Buren, West Tower
Harlingen, Texas 78550
Attorneys for Children and Adults with Attention-Deficit/Hyperactivity Disorder
(CHADD)

Melissa A. Miles